COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-028-CV

 

 

IN THE INTEREST OF K.P., A CHILD                                                        

 

 

 

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                            Introduction








Appellants B.P. (Mother) and C.P. (Father)
separately appeal the trial court=s order
terminating their parental rights to their child, K.P.[2]  In three issues, Mother contends that the
trial court abused its discretion by denying her motions to extend the
statutory dismissal deadline and for a continuance and that the evidence is
factually insufficient to prove that termination of her parent-child
relationship is in K.P.=s best interest.  Father contends in two issues that the trial
court abused its discretion by denying his motion to extend the statutory
dismissal deadline (of which he joined with Mother) and that the evidence is legally
and factually insufficient to prove that termination of his parent-child
relationship is in K.P.=s best interest.[3]  We affirm.

                                        Background
Facts

On January 11, 2008, the Texas Department of
Family and Protective Services (the Department) received a referral from John
Peter Smith Hospital that a child, K.P., had been born with cocaine in his
meconium four days earlier.  The
Department assigned an investigator to the referral, appointed Jeanette Leong
as its caseworker, removed K.P. from his parents=
custody, placed him in foster care, and filed a petition for K.P.=s
protection when he was a week old.[4]  The parents answered the Department=s
petition through general denials.








While conducting its investigation on the day it
received the referral, the Department discovered that Mother, who was
twenty-three years old at K.P.=s birth,
had a previous case with the Department in Kerrville involving her other two
children.[5]  Mother admitted to a history of drug use,
including attending a party in May 2007 in which she used methamphetamine and
cocaine.  Although Mother initially told
an investigator that she had stopped using drugs when she discovered she was
pregnant, she later admitted that she used cocaine as recently as one month
before K.P.=s birth.  Father told the investigator that he had used
marijuana a year and a half to two years before K.P.=s birth.

Mother had begun Community Addiction Treatment
Services (CATS)[6]
in August 2007 as a result of her previous case in Kerrville.  But Mother used methamphetamine while
attending CATS, and she left the program three months later after completing
only half of the program=s sessions.








Leong created separate service plans for Mother
and Father, and she explained those plans to them in January 2008.[7]  They agreed to complete their plans.

The Department recommended that Mother complete
inpatient treatment for her drug problems, but Mother refused because she does
not Ado well
in a lock-up setting.@ 
Instead, Mother voluntarily joined the Family Drug Court Program (the
Program).  In doing so, she agreed to
complete the Program Ato the satisfaction of the
Court, including faithful attendance@ at all
counseling sessions.

The Program provided Mother with immediate
specialized services,[8]
and it allowed Mother two-hour visits with K.P. twice per week, compared to a
normal Department case, in which a parent receives a one-hour visit once per
week.  Mother received time and budget
management instruction as part of the Program, but issues related to her
bipolar disorder were never resolved.








The Program required Mother to attend
twenty-eight group meetings and four individual meetings.  Father was not eligible to officially be part
of the Program because it was designed for mothers and children, but he did
benefit from Mother=s involvement because he was
allowed to attend team meetings and treatment sessions, and he was able to
enjoy the extended visitation periods allowed by the Program.

In March 2008, the Department placed K.P. with
Father=s
grandmother (Great-Grandmother), who lived next door to the parents.  Mother visited K.P. consistently through
April 2008, when she started working about thirty-five hours per week as a
cashier at Wal-Mart.








During Mother=s time
in the Program, Father experienced serious medical problemsChe had
emergency surgery to remove his appendix on the day K.P. was born, he was
hospitalized three or four times for more than a month cumulatively for various
medical issues, and he had numerous doctor visits.  The Department did not provide Father with
counseling for the management of his time, budget, or anger, which he requested
but was not part of his service plan. 
Father took parenting classes and a psychological exam and attended some
marriage counseling, and the Department administered two lab urinary analyses
(UAs) and four or five drug tests to him at his home during the course of the
service plan.[9]


In June 2008, the Department required either
Mother or Father to visit K.P. each night by 6 p.m. or be fined.  The Department did that because, at the time,
the Department believed it was appropriate to test the parents= ability
to take care of K.P., and the 6 p.m. deadline simulated the parents=
responsibility if K.P. was reunified with them but they had to place him in day
care because of their work schedules.

Mother eventually found the requirements of the
Program too stressful.  In July 2008,
after being counseled at her house by a Program team, Mother asked to leave the
Program, and the trial court discharged her from it.








Mother=s visits
with K.P. were sporadic from June to August 2008, and Father=s visits
were Avery
minimal.@  After Mother voluntarily left the Program in
July 2008, the Department was unable to locate both Mother and Father until
October 2008.  Other drug users lived
along with Mother and Father in the house that they were renting next to
Great-Grandmother.  They eventually moved
out of that house because they could not pay their rent, and they began using
heroin together.  They were both arrested
and incarcerated for stealing from Target in October 2008.  Mother was released from jail on October 31,
2008, just over a month before the start of the termination trial, and Father
was released in early November. 

Father theorized that the 6 p.m. visitation
deadline, coupled with the other activities that the Department scheduled,
created stress and caused the parents=
relapses and their noncompliance with their service plans.  However, a CATS program manager
testified that the parents started wanting to leave the Program in March 2008,
before the Department imposed the deadline.

After her release from jail, Mother completed an
inpatient detoxification program and began receiving services from Helping Open
People=s Eyes
(HOPE).[10]  After his release from jail, Father began
seeing psychiatrists and began attending appointments at MHMR and HOPE as well
as church and a Bible study.








Father began working sixty to seventy hours a
week as a manager at Hollywood Video about two weeks before the trial.  He worked mostly nights so he and Mother
would not have to pay for day care if K.P. was returned to them.  Mother began working at Wendy=s three
weeks before the trial.  The parents
moved into Father=s mother=s house
once they were out of jail, conditioned upon their remaining drug-free and
seeking counseling.

Following a trial that began in December 2008,
the trial court terminated the parents= rights
in January 2009.  The court found that
each parent knowingly placed or allowed K.P to remain in conditions that
endangered his physical or emotional well-being, engaged in conduct or placed
K.P. with persons who engaged in conduct that endangered his physical or
emotional well-being, and constructively abandoned K.P. while he was in the
permanent or temporary managing conservatorship of the Department.  The court also found that termination was in
K.P.=s best
interest.  The parents separately filed
timely notices of appeal.

                 Denial
of the Motions for Continuance and Extension

Initially, both parents contend that the trial
court erred by denying their joint motion for an extension of the dismissal
deadline.[11]  In her second issue, Mother contends that the
trial court also erred by denying her motion for a continuance.








Continuance standards

We review a trial court=s ruling
on a motion for continuance for an abuse of discretion.  See BMC Software Belg., N.V. v.
Marchand, 83 S.W.3d 789, 800 (Tex. 2002). 
We do not substitute our judgment for that of the trial court.  In re Nitla S.A. de C.V., 92 S.W.3d
419, 422 (Tex. 2002) (orig. proceeding). 
Instead, we must determine whether the trial court=s action
was so arbitrary and unreasonable as to amount to a clear and prejudicial error
of law.  Joe v. Two Thirty Nine Joint
Venture, 145 S.W.3d 150, 161 (Tex. 2004).

A motion for continuance shall not be granted
except for sufficient cause supported by an affidavit, through consent of the
parties, or by operation of law. 
Tex. R. Civ. P. 251; see In re E.L.T., 93 S.W.3d 372, 374
(Tex. App.CHouston [14th Dist.] 2002, no
pet.).  An abuse of discretion does not
occur where the trial court bases its decision on conflicting evidence or when
some evidence of substantive and probative character exists to support the
decision.  In re D.W., 249 S.W.3d
625, 647 (Tex. App.CFort Worth) (en banc), pet.
denied, 260 S.W.3d 462 (Tex. 2008).

Extension standards








A trial court must dismiss a suit affecting the
parent-child relationship if it has not rendered a final order or granted an
extension on the first Monday after the first anniversary of the date the court
rendered a temporary order appointing the Department as temporary managing
conservator.[12]  Tex. Fam. Code Ann. ' 263.401(a)
(Vernon 2008).  The trial court may grant
an extension of up to 180 days if it finds that Aextraordinary
circumstances necessitate the child remaining in the temporary managing
conservatorship of the department and that continuing the appointment of the
department as temporary managing conservator is in the best interest of the
child.@  Id. '
263.401(b).  Because an extension of the
dismissal date is similar to a continuance and section 263.401(b) does not
specify which appellate standard of review should apply, we apply the abuse of
discretion standard.  D.W., 249
S.W.3d at 647; see In re J.A., No. 02‑05‑00454‑CV,
2006 WL 3114434, at *9 (Tex. App.CFort
Worth Nov. 2, 2006, no pet.) (mem. op.).

Analysis








Mother filed for a continuance and extension
because she was Acurrently working her service
plan@ and
because she had completed some portions of that plan.  In post-trial motions, Mother and Father
separately argued, AProceeding with trial when
[Mother or Father were] so close to completing [their] services prevented
[them] from showing the finder of fact that [they were] both capable and
willing to parent [their] child.@  Mother argues on appeal that the continuance
or extension should have been granted because a 180-day delay in the trial
proceedings would not have harmed K.P., and Father asserts that his medical
condition and the parents= downfall allegedly caused by
the Program created extraordinary circumstances that required an extension of
the deadline.  They do not contend that
they were unprepared for the termination trial.








We have repeatedly held that when a parent, through
his or her own choices, fails to comply with a service plan and then at the
time of the termination trial requests a continuance or an extension of the
statutory dismissal deadline in order to complete the plan, the trial court
does not abuse its discretion by denying the continuance or extension.  See, e.g., In re M.M.F., No. 02‑08‑00014‑CV,
2008 WL 5265033, at *13 (Tex. App.CFort
Worth Dec. 18, 2008, no pet.) (mem. op.); see also In re A.H., No. 04‑06‑00055‑CV,
2006 WL 1473696, at *1 (Tex. App.CSan
Antonio May 31, 2006, no pet.) (mem. op.) (holding similarly).  The record demonstrates that the parents
received their service plans in January 2008. 
Leong explained the service plans to the parents at that time.  However, at the time of the trial in December
2008, eleven months later, neither parent had completed his or her service plan=s
requirements.[13]

Mother visited K.P. regularly for the first two
months after the Department placed him next door with Great-Grandmother.  But when she started working, she only
visited him sporadically, and she saw him only once in the four months before
the trial.  She dropped out of the drug
court program that she had voluntarily entered.[14]  She did not complete random drug tests, and
she was only clean for around fifty days before the start of the trial.  Mother did not significantly change her
behavior until she was in jail, two months before the termination trial.  She testified that the Department gave her
sufficient assistance in completing her service plan but that she was still
unable to do so.

Under these facts, we cannot conclude that the
trial court abused its discretion by denying Mother=s
continuance or extension for more time to complete her service plan.








Likewise, we are unpersuaded that an extension
should have been granted because Father had medical issues during the time he
was given to complete the service plan. 
Over the year Father had to complete his service plan, he was
hospitalized for around thirty days and had multiple hospital visits.  But he did not regularly visit K.P. when he
was not in the hospital.  Father last
visited K.P. in July, five months before the start of the termination
trial.  Father also did not change his
behavior and his drug use until he was in jail in October, nine months after
having been given his service plan and only two months before the trial. 








Statements and implications in Father=s brief
on this issue conflict with the record. 
For instance, although Father argues that Aonce [Mother]
exited [the Program], she was written off and forgotten by the Department,@ the
record establishes that the Department wrote letters and left messages for
Mother and Father, but that the parents chose not to contact the
Department.  Also, although Father
contends that he was excluded from the Program and was therefore Adiscriminated
against in the most blatant fashion from the inception of the case,@ the
evidence demonstrates that he received the benefits of the Program even though
his personal desire was to not take part in the Program at all.  Finally, we note that although the parents
contend that an extension or continuance would not have harmed K.P., if the
trial court=s termination decision would not
have changed in the six-month interval caused by an extension, the delay would
have put the Department=s eventual adoption goal for
K.P. (whether with Great-Grandmother or a nonrelative, as explained below) on
hold.

Therefore, we hold that the trial court did not
abuse its discretion by denying the parents= motions
for continuance or extension. 
Accordingly, we overrule Mother=s first
and second issues, and we overrule Father=s first
issue.

                                 Legal
and Factual Sufficiency

In his second issue, Father contends that the
evidence is legally and factually insufficient to show that termination of his
parental relationship with K.P. is in K.P.=s best
interest.  In her third issue, Mother
contends that the evidence is factually insufficient to show that termination
of her parental relationship with K.P. is in his best interest.  We will discuss Father=s
complaint about legal and factual sufficiency together with Mother=s
factual sufficiency complaint.

Standards of review








Termination of parental rights is a drastic
remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.  Tex. Fam. Code Ann. ''
161.001, 161.206(a) (Vernon 2008); In re J.F.C., 96 S.W.3d 256, 263 (Tex.
2002).  This intermediate standard falls
between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort
Worth 2006, pet. denied).  It is defined
as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@ 
Tex. Fam. Code Ann. ' 101.007
(Vernon 2008).

Legal sufficiency

In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a factfinder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could, and disregard contrary evidence unless a
reasonable factfinder could not.  Id.








We must therefore consider all of the evidence,
not just that which favors the verdict. 
Id.  But we cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the factfinder=s
province.  Id.  And even when credibility issues appear in
the appellate record, we must defer to the factfinder=s
determinations as long as they are not unreasonable.  Id.

Factual sufficiency

In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s
findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that the termination of the parent=s
parental rights is in the best interest of the child.  Id.; In re C.H., 89 S.W.3d 17,
25, 28 (Tex. 2002).  If, in light of the
entire record, the disputed evidence that a reasonable factfinder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction in the truth of its
finding, then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.








Applicable law

A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  C.H., 89 S.W.3d at 26.

In a termination case, the State seeks not just
to limit parental rights but to end them permanentlyCto
divest the parent and child of legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination in favor
of the parent.  Holick, 685 S.W.2d
at 20B21; In
re E.M.N., 221 S.W.3d 815, 820 (Tex. App.CFort
Worth 2007, no pet.).








In proceedings to terminate the parent-child
relationship brought under section 161.001 of the family code, the petitioner
must prove that termination is in the best interest of the child.[15]  Tex. Fam. Code Ann. '
161.001(2); see In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. '
263.307(a) (Vernon 2008).  In determining
a child=s best
interest, courts should consider whether there is a history of substance abuse
by the child=s family or others who have
access to the child=s home and whether the child=s family
demonstrates adequate parenting skills.  Id.
'
263.307(b)(8), (12).

Other factors that the trier of fact in a
termination case may use in determining the best interest of the child include:

(1)    the desires of the child;

 

(2)    the
emotional and physical needs of the child now and in the future;

 

(3)    the
emotional and physical danger to the child now and in the future;

 

(4)    the parental abilities of the individuals
seeking custody;








(5)    the
programs available to assist these individuals to promote the best interest of
the child;

 

(6)    the
plans for the child by these individuals or by the agency seeking custody;

 

(7)    the stability of the home or proposed
placement;

 

(8)    the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and

 

(9)    any excuse for the acts or omissions of the
parent.

 

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).

Undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  C.H.,
89 S.W.3d at 27.  On the other hand, the
presence of scant evidence relevant to each factor will not support such a
finding.  Id.  Some listed factors may be inapplicable to
some cases; other factors not on the list may also be considered when
appropriate.  Id.  For this reason, we will only discuss the
factors which were made relevant by the evidence submitted at the trial and
will combine our analysis of factors where the evidence may concurrently apply.








Analysis

The desires of K.P. and the parental abilities of
Mother and Father

K.P. was less than a year old at the beginning of
the termination trial and could not therefore specifically express his
desires.  However, testimony indicated
that he had not bonded emotionally with the parents because they did not visit
him consistently.  Even though K.P. was
in the house next door to the parents throughout much of the time of this case,
they did not always visit when they were home.

When the parents did visit K.P., they did not
give K.P. all of their attention.  For
example, they sometimes talked on their cell phones or sent text messages while
visiting K.P.  Great-Grandmother
testified that when Mother was with K.P., sometimes she Awould
play with him and then sometimes she would pass him off to [Father] and not
want to have anything to do with him.@  Great-Grandmother also said that Mother would
sometimes Ajust lay [K.P.] on the couch . .
. and walk off.@








As the parents= case
with the Department progressed, the parents visited K.P. with decreasing
frequency.  Mother visited K.P. fourteen
times in May 2008, twelve times in June, eight times in July, and just four
times through half of August.  Mother
visited K.P. only once from mid-August to the beginning of the trial in
December 2008, and she did not make contact with her caseworker at all from the
middle of August until the end of October of that year.

Father visited K.P. ten times in May, four times
in June, six times in July, and just once in the first half of August.  Father also lost complete contact with the
Department=s caseworker from August until
October 2008.  Although the evidence
demonstrated that Mother and Father made better attempts to visit K.P. in the
month preceding the trial, conflicting schedules of the parents with the
Department and K.P. being sick blocked those attempts.

Mother cited A[w]ork
reasons and depression@ as the reasons she did not
visit K.P.  Father stated that his work
schedule and drug treatment conflicted with him visiting K.P.  He thought that it was impossible to complete
all of the tasks that the Department had requested.

Mother even said at one point that she did not
want K.P. and did not love him.  She once
told her caseworker that she did not feel bonded with K.P. and that she wanted
to go back to Kerrville to be with her other children.

The
stability of the parents= home and the plans for K.P. by those seeking
custody

 








At the time of the trial, the parents had been
living with Father=s mother and her fiancé in her
two-bedroom duplex for just over a month. 
To remain there, Mother and Father must stay free of drugs (which they
have been unable to do for any significant length of time) and obtain
counseling.  Father=s mother
has a history of using drugs, although she had not used drugs in the five years
preceding the trial.  Her fiancé has a
conviction for assault.

After moving out of the house next to
Great-Grandmother in September, until moving in with Father=s mother
in November, Mother lived in her car and in motels.  Mother stated that the house that she and
Father had lived in next to Great-Grandmother was not stableCit had
broken windows and floors, and it was not suitable for children. 

By comparison, Great-Grandmother, whom K.P.
remained with at the time of the trial, was attentive to K.P.=s
emotional needs, was in compliance with the Department=s plans
for him, and was providing him a stable home. 
Great-Grandmother testified that at the time of the trial, K.P. was Aa happy
little boy and [he was] very healthy.@  Great-Grandmother was making plans to adopt
K.P., and the Department=s only concerns about those
plans was Great-Grandmother=s age
(she was 72 years old at the time of the trial) and whether Great-Grandmother
could support K.P. financially until he was eighteen years old.  Mother testified that if her rights to K.P.
were terminated, she wanted Great-Grandmother to continue to care for K.P.  If the Department determined that
Great-Grandmother could not provide for K.P.=s
long-term needs, it planned on allowing a nonrelative to adopt K.P.








Mother provided some financial support for K.P.
while Great-Grandmother took care of him, but she last bought diapers for him
in June 2008, six months before the trial. 
At the time of the trial, the parents had not made plans for a car seat
or a crib if the court returned K.P. to them, although it seemed that these items
could be easily obtained.

The
present and future potential for emotional and physical danger to K.P., the
acts or omissions of the parents which may indicate that their relationship
with K.P. is not proper, any excuse for the parents= acts or omissions, and
the programs available to assist the parents

 

The parents have long-standing, persistent drug
problems.  For instance, Mother used
cocaine for several years before K.P.=s
birth.  She also used methamphetamine on
and off since 2002.  Mother and Father
used heroin together in July 2008, while K.P. was in the custody of the
Department.

Mother admitted that, as a parent, using those
types of controlled substances endangers her child.  But she used ecstasy in June 2008 and heroin
in September 2008 and again in October 2008, after completing her
detoxification program and just before going to jail.








The Department requested that Mother complete
inpatient treatment for her drug problems, but she declined doing so because
she had a Afear of confinement and she felt
that she could be more successful with an outpatient program.@  Mother had a support group and was seeking treatment
for her drug use through MHMR, HOPE and Narcotics Anonymous (NA) at the time of
the trial,[16]
and she had been drug-free for around two months.  However, she had participated in similar
programs in the past, including completing CATS in 2007, participating in drug
treatment in early 2008, and completing a detoxification program in October
2008, and she had relapsed after her involvement in all three of those courses
of treatment.  The trial court could have
reasonably inferred that she would relapse again.  See Williams v. Williams, 150 S.W.3d
436, 451 (Tex. App.CAustin 2004, pet. denied); In
re K.A.S., 131 S.W.3d 215, 230 (Tex. App.CFort
Worth 2004, pet. denied) (explaining that a trial court Ais not
required to believe that there has been a lasting change in a parent=s attitude@).








Mother did not take full advantage of the
treatment available for her.  She
completed her psychological evaluation and her parenting classes, but she did
not, as required by the service plan, complete all of her substance abuse
classes, complete CATS after-care,[17]
consistently maintain an NA sponsor, or take some random UAs.  A permanency progress report indicates that
most of Mother=s problems with the service plan
began to arise in July 2008.

During the Department=s
involvement with K.P., Mother cut herself (including as recently as October
2008), and during a cross-examination, Mother admitted to having had suicidal
thoughts since K.P=s removal.  According to Great-Grandmother, Mother and
Father may have also stolen Great-Grandmother=s bank
card and emptied her checking account. 
Mother admitted that the words Adrug-using,
drug-seeking, and not stable@ were
appropriate to describe her behavior just before the termination trial began.

Father admitted to using heroin as far back as
2005, and he has been using drugs in general since he was fourteen years
old.  He conceded that he smoked
marijuana and used heroin before K.P.=s birth,
and he admitted that he used heroin within two months of the trial date.  He told Great-Grandmother that he also used
ecstasy.  He knew about Mother=s drug
use while she was pregnant with K.P., but he said and did nothing about
it.  He also has a long criminal historyChe
received deferred adjudication for a felony drug charge in 1999, pled guilty to
driving under the influence of drugs in that same year, and pled guilty to
separate thefts he committed in September and October 2008, just months before
the termination trial.  Mother also pled
guilty to the October 2008 theft.








Although Father blamed the schedule of the
Department=s treatment programs and its
employees for his relapse, he admitted that his relapse did not occur until
around the time that Mother left the Program, and he conceded that he continued
to use drugs (and stole from Target) after the stress that he alleged the
Program caused was removed.  Also, like
Mother, although Father was seeking treatment for his drug use at the time of
the trial, he had previously participated in drug treatment programs and had
relapsed after completing those programs, including relapsing after a
detoxification program in October 2008. 

Father=s poor
choices are also reflected by his selling some prescription drugs to one of his
friends and knocking holes in walls because he was angry with Mother.  When Father was asked by the Department=s
attorney whether his using drugs and stealing endangered K.P., Father
responded, AI refuse to answer any more
questions.@

Our holding








We hold that these facts, considered under the Holley
factors and viewed in the light most favorable to the trial court=s
judgment, enabled the trial court to reasonably form a firm conviction or
belief that termination of Father=s
parental rights was in K.P.=s best
interest.  See Holley, 544 S.W.2d
at 371B72.  Therefore, we hold that the evidence was
legally sufficient to support the trial court=s best
interest finding as to Father.  See
J.P.B., 180 S.W.3d at 573.  We also
hold that, giving due deference to  the
trial court=s determination, the evidence is
factually sufficient to support the trial court=s
judgment terminating both parents= rights
because the trial court could reasonably form a firm conviction or belief that
termination is in K.P.=s best interest.  See C.H., 89 S.W.3d at 28.  Accordingly, we overrule Father=s second
issue and Mother=s third issue.

                                             Conclusion

Having overruled all of Mother=s and
Father=s
issues, we affirm the trial court=s order
terminating their parental rights to K.P.

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, MCCOY, and MEIER, JJ.

 

DELIVERED: August 13,
2009











[1]See Tex. R. App. P. 47.4.





[2]The names of the parties
involved in this appeal have been replaced with initials.  See Tex. R. App. P. 9.8(b); Tex. Fam.
Code Ann. ' 109.002(d) (Vernon 2008).  We will refer to B.P. as Mother, C.P. as
Father, and B.P. and C.P. collectively as Athe parents@ in the remainder of this opinion.





[3]Because Mother=s and Father=s issues are similar and
relate to the same portions of the record, we will address them together.





[4]The Department=s petition sought
termination of the parents= rights if reunification could not be
achieved.  The trial court signed an
order authorizing K.P.=s removal and naming the
Department as K.P.=s temporary managing
conservator.





[5]During the course of this
case, Mother voluntarily relinquished her parental rights to her two other
children.





[6]CATS, a division of
Mental Health and Mental Retardation (MHMR), is an outpatient drug treatment
program.





[7]The Department filed the
parents= service plans in March
2008.  The service plans expressed the
parents= need to stay drug-free,
complete drug-related programs and other programs and evaluations, and visit
K.P. at least once per week.





[8]For instance, she
received psychiatric services not routinely made available for parents involved
in Department cases because she was enrolled in the Program, and she had a
larger support team to provide transportation and other needs.





[9]Father tested negative on
the UAs that he took, but he stopped taking them in June 2008, when he lost
contact with the Department.





[10]HOPE is a Christian-based
weekly outpatient drug treatment program. 
Mother had completed only one weekly session at the time that the trial
began.





[11]Mother and Father appeal
separately.  Because the issues related
to a continuance and an extension are similar and the motions were made
together at the trial and are briefed similarly on appeal, we will address them
together.





[12]In this case, the trial
court named the Department temporary managing conservator on January 14,
2008.  The trial court heard and denied
the motions for a continuance and an extension on December 9, 2008, about a
month before the dismissal deadline.





[13]We are reviewing here
evidence relative to the termination only for purposes of evaluating the trial
court=s discretion in granting
or denying the continuance or extension.





[14]At the trial, Mother
explained about the Program, A[I]t was like everything we were doing was not
right.  It was like we couldn=t do anything right, and
I had just had enough.@  Father stated about the Program, AI was doing everything
they wanted me to do, and it was like the harder I tried, the more I got done,
the more I got yelled at and told I wasn=t doing right.@





[15]A petitioner must also
prove that the parent has violated one of the provisions contained in section
161.001(1) of the family code.  See
Tex. Fam. Code Ann. ' 161.001(1).  However, neither parent has challenged the
trial court=s findings under that
subsection.





[16]Mother went to fifteen NA
sessions from November 11, 2008 to December 17, 2008.





[17]A Department
representative explained, AAfter-care is just as important as going to the
groups, because after-care helps set a foundation for sustained sobriety.@